In the Matter of SAMUEL A. LANGFUR, an Attorney, Respondent.

First Department, January 10, 1930.

*Einar Chrystie*, for the petitioner.

*Charles A. Oberwager*, for the respondent.

DOWLING, P. J. The respondent was admitted to the bar in June, 1906, in the New York Supreme Court, Appellate Division, Second Department.

In this proceeding the petitioner presented an original and a supplemental petition. In the original petition the charge is that the respondent has been guilty of misconduct as an attorney at law as follows: In 1925 Isaac Kruger retained the respondent to bring actions in behalf of his wife and himself against one Fleischer to recover damages for personal injuries suffered by Kruger's wife.

Thereafter the respondent represented to Kruger and his wife that he had arranged to settle their claims for the sum of $900. They agreed to accept this amount and executed releases of their claims which were delivered to the respondent. On or about March 1, 1927, the respondent delivered the releases to the Fidelity and Casualty Company of New York and received from the company a check for $900 in settlement of said claims. The respondent cashed this check and converted the entire proceeds thereof to his own use. From time to time after he had received the money he falsely represented to his clients that he had not received it, and up to the time when the matter was brought to the attention of the petitioner's committee on grievances, the respondent had not paid to his clients any part of the money collected, although he had previously stated that he intended to give them $500 as their share thereof.

The respondent answered by way of a general denial, and in addition alleged that he duly paid to Sarah Kruger the sum of $500 in full for all moneys due and owing by him upon the settlement of the said actions and in full for her and her husband's loss of service share therein, and that said Sarah Kruger duly received the sum of $500 out of said settlement in full on her behalf and on behalf of her husband.

The supplemental petition charged that the respondent had been guilty of misconduct as an attorney at law as follows: That on or about June 1, 1927, Mrs. Annie Dunst retained the respondent as her attorney to collect her claim for $10,000 against the Travelers Insurance Company. The respondent agreed to accept thirty-seven and one-half per cent of any sum which he might recover in his client's behalf as his fees for services in the matter. A few days thereafter the respondent advised Mrs. Dunst that he could settle her claim for $5,000 and she agreed to accept the offer.

On or about June 9, 1927, the respondent received from the Travelers Insurance Company the sum of $5,000 in settlement of Mrs. Dunst's claim. During the months of July and August Mrs. Dunst asked the respondent if he had received the money from the insurance company and he falsely stated to her that he had not received it. In September Mrs. Dunst, having learned from other sources that on or about June 9, 1927, the respondent had received $5,000 in settlement of her case, called upon the respondent and told him that she had been so advised. On or about September 20, 1927, the respondent gave Mrs. Dunst $1,600 in cash and two checks, one for $400 and the other for $1,125, in payment of her share of the money he had collected from the insurance company, it being agreed at that time that the check for $400 was to be

deposited a week after the delivery thereof and the check for $1,125 two weeks after the delivery thereof. When the checks were deposited in accordance with this agreement, they were returned by the bank upon which they were drawn because of insufficient funds to the credit of the respondent's account.

On or about September 22, 1927, Mrs. Dunst retained another attorney to look after her interests and on that day he collected $400 from the respondent on account of the money due his client. On October 5, 1927, the further sum of $900 was collected from him, and on October 7, 1927, he paid the balance of $225 to Mrs. Dunst's attorney.

It is charged that between June 9, 1927, and October 7, 1927, the respondent converted to his own use the moneys collected in behalf of his client, Annie Dunst, from the Travelers Insurance Company, except so much thereof as was paid by him to her from time to time as above stated.

To this supplemental petition the respondent answered also by way of a general denial, and in addition alleged that he had duly and fully paid prior to the time of any complaint or prior to the time of the making of the alleged charge, in accordance with and pursuant to his agreements and at the time and manner agreed upon, all moneys due or owing or to be paid to the person therein named.

The charges were referred to one of the official referees, who has reported that in his opinion the charge contained in the original petition (the Kruger case) had not been sustained, and that the charge contained in the supplemental petition (the Dunst case) had been sustained.

The record discloses that in 1926 Sarah Kruger was injured in an accident at the Flagler House, South Fallsburg, N. Y. She is related to respondent through marriage and has known him since she was a child. After the accident she and her husband, Isaac Kruger, retained respondent to collect damages sustained by them as a result of the accident. In February, 1927, they agreed to settle their claims for $900, and executed general releases, and on March 1, 1927, respondent received from the insurance company a check for the sum of $900, which he deposited in his account in the Chelsea Exchange Bank on March 2, 1927. On June 20, 1927, Isaac Kruger complained to the Bar Association, stating in substance that in response to several telephone calls and in answer to an inquiry made of respondent personally at his office on June eighteenth, the respondent had informed him that he had not yet received the check in settlement of the claims and that no part of the money collected by the respondent had been

accounted for. The respondent testified that after he collected the $900 from the insurance company, Isaac Kruger telephoned and arranged to call at his office the end of the week when in accordance with Kruger's request respondent would have the Krugers' share of the settlement in cash ready for delivery; that on March 5, 1927, he withdrew $750 from his account for the purpose of using $500 thereof to pay the Krugers; that thereafter he received a telephone message from Mrs. Kruger to the effect that she had had a dispute with her husband and she claimed all the money collected as her property; that respondent then placed the money in his safe deposit vault; that when Kruger called respondent informed him of what his wife had said and declined to give him the money; that the matter remained in this state until the following June when he decided to send the money to Mrs. Kruger, and did so a week before he heard from the Bar Association. Mrs. Kruger testified that before the settlement her husband had said to her, " Now, whatever my share is I am going to give it to you." She further testified:

" * * * Mr. Langfur called me up several days after this agreement that I was willing to settle at that * * * and he told me that he had the money. Well, I didn't want to accept it just then because my husband — I was aware at that time that my husband wanted to spend that money, the full $500, and I didn't want him to spend it, so I called up Mr. Langfur and asked him to do this personal favor and hold the money,— that I didn't need it just then, he should please hold it for me. * * *

" Well, he kept it,— when, when about two months passed I called him up and asked him whether he could please let me have the money. * * * And he told me that he didn't have it just then, but he says as soon as he gets the money, why, he will return it to me, see. This was supposed to be sort of a friendly agreement, you know. About a month later Mr. Langfur did — he called me up and asked me to come down for the money, but I couldn't leave my place of business then so he sent it to me."

Respondent testified that a few days after he was retained by the Krugers, Mr. Kruger stated to him that so far as he, Kruger, was concerned, he was not interested in any way in the money in the proceeding; that whatever respondent could recover, Kruger was glad to let his wife have.

The conclusion of the learned referee, so far as the Kruger charge is concerned, we think is sustained by the record. It is believable that, because of their domestic situation, Mrs. Kruger made the arrangement with respondent to hold the proceeds of the settlement. As to the husband's share, on the testimony of

Mrs. Kruger and of respondent himself, the conclusion of the referee is also warranted. We agree that this particular charge should be dismissed.

With reference to the Dunst charge, the record shows that in June, 1927, Mrs. Annie Dunst retained respondent to collect the proceeds of a policy of life insurance issued by the Travelers Insurance Company on the life of her husband who died August 25, 1926. It was agreed that respondent was to retain thirty-seven and one-half per cent of any amount collected by him as a fee for his services in the matter. With Mrs. Dunst's approval, respondent settled her claim on or about June 10, 1927, for $5,000, and received a check for that amount which he deposited in his account in the First National Bank of Brooklyn. Under the retainer, respondent was entitled to $1,875 out of this settlement, and Mrs. Dunst was entitled to the balance, amounting to $3,125. Mrs. Dunst testified that after she signed the general release she waited until about the middle of July, when she telephoned to respondent and asked about her money; that respondent said he was going on his vacation and requested her to call later; that she telephoned respondent the end of July and he told her to call the following week. She called at his office Monday of the following week, and respondent gave her a check for $3,125 dated ahead (September 10, 1927). The check was deposited by her brother-in-law but was dishonored. When the check came back she called up respondent and asked him, " What about that money? " And respondent said, " Well, all right. We will have to wait a couple of days." She went to respondent's office after a couple of days, but did not see him, and the next day received a letter from him asking her to call. She went the following week, gave the $3,125 check to the girl in respondent's office and received from her $1,600 in cash, one check for $400 and another check for $1,125. These two checks were undated. She gave these checks to a man named Locker to whom she owed money, he dated them, deposited them, and they came back " short." Thereafter Mrs. Dunst consulted and retained another attorney, Solomon H. Bauch.

Mr. Bauch testified that Mrs. Dunst retained him on September 21 or 22, 1927; that after the checks were returned with the slips " Not sufficient funds " he called up respondent who informed him that he would deliver to Locker's store that evening $400 in cash, and as to the other check Bauch should call him up the next day. The $400 was received by Locker that evening. The following day Bauch called respondent, and at respondent's request, Bauch went to see him. Respondent told Bauch he could go to the bank the next day and certify the check. The next day

Bauch presented the check for certification and was informed there were no funds. Bauch called respondent on the telephone and an arrangement was made for Bauch to be at respondent's office at two o'clock. Upon calling at respondent's office at two o'clock, respondent told Bauch that his boy was at the bank with a blank check to draw out all the cash; that there was only $900 there, and the boy would come back with it and Bauch could have it. After consultation on the telephone with Mrs. Dunst, Bauch accepted the $900 and respondent promised the balance of $225 on Friday (this promise was given on Wednesday preceding the Day of Atonement). On Friday Bauch called at respondent's office, but respondent was not there. Later respondent sent to Bauch's office $225 in cash and received the check for $1,125.

This matter was brought to the attention of the Bar Association by Bauch after final payment.

Respondent's version of these occurrences is that while negotiations were pending for the settlement of the insurance policy claim, Mrs. Dunst retained him in two additional matters — the first, a claim against Eisenberg & Son to recover $500 loaned by her husband in his lifetime; and the second, to recover back the premises 2314 Mermaid avenue, Coney Island, which had been conveyed by her husband, Meyer Dunst, to the Republic Holding Company as security for a loan made to him by that corporation, and upon which the corporation claimed a balance of $1,770, with interest for two years. When the check was received from the insurance company, he says Mrs. Dunst was at his office, and "I told her that the money was available, and that I would proceed with her other matters, and try to get her as substantial a settlement as in this matter. I told her she could have her money immediately. She says no, she does not want her money; her season was right after Labor Day. She had a restaurant in Coney Island. She wanted to collect all her money together, redeem this property, settle all accounts, pay whatever she had to pay, and at the time did not want any one to know about the collection of the money. I told her at that time, and I suggested to her, that if she wanted to keep the money, I would hold the money intact; that I would hold the money and give her a check for this money, and at the same time I gave her a check which she received, and which is before your Honor at the present moment, for her entire interest $3,125, dated September 10th, 1927, to the order of Annie Dunst. * * * "

Respondent became ill in the latter part of August, 1927, and, as he testified: " * * * I was confined actually in bed. At the end of August, if your Honor pleases, I received a telephone

call that this check of $3,125 had been presented to the bank eleven days prior, August the 29th, 1927, for collection. I told Mr. Lockwood that it was impossible, the money was in my vault to meet this check; that I had contemplated and expected to meet this check on the 10th, according to her statement; that I could not possibly get down to the office, and that it was not due until the 10th of September, according to her own agreement; that I could not understand how it was possible for her to deposit a check * * *.

" The check was dated for September 10th, if your Honor pleases. (Continuing) — how it was deposited on the 29th, as the record shows. Mr. Lockwood said, ' Nevertheless, it was deposited, and she has telephoned, and she wants her money.' I said ' I expect to be down in the office shortly, and I will give her all her money.' In the meantime I took the matter up with Mr. Lockwood, to dispose of it, and Mr. Lockwood called up and told me that she needed $1,600 at once; that she was indebted to a man by the name of Locker for $400; that she was indebted to her brother-in-law, a man by the name of Hirschkowitz, for a thousand dollars and interest, and that she needed at the present moment this $1,600 in cash, and the other two checks could be made out to her. I went to the office, went to the vault, took out $1,600 in actual cash, and left the same in my office with a receipt, which I dictated."

Further he testified: " She told me that she had to pay Mr. Locker $400, and that Mr. Locker, she would give the check to him, but she would first notify me when she would give the check to him. On the 21st of September, I got a notice from Mr. Locker that he had a check. I said ' I will send the cash out to you.' He said, ' No, I will present it to the bank.' I said, ' No, I will send the cash out to you.' I sent the cash out to Mr. Locker and received his receipt, dated September 22nd, 1927.

" * * * Mr. Locker called me up and I immediately sent him $400 in cash, the same day he telephoned to me, and took away this check from him. I never met Mr. Bauch. The statement that he said he met me at the time of this $400 check is absolutely inaccurate. I never telephoned Mr. Bauch the dates that he said, that I had paid at that time $2,000 — $1,600 in cash to Mrs. Dunst, and $400 to Mr. Locker. The way she wanted — the agreement was that she was to notify me when she was to put it through, because she did not know when she was to give him this money. This thousand dollars was money that she owed to her brother-in-law with two years' interest. She wanted — the balance was $1,125, and wanted the check made out. I met Mr.

Bauch one day prior to our New Year's holidays. I believe it was on October the 4th — the 5th, I think it was. It was the first time I ever saw him. He came to the office and said that Mrs. Dunst had retained him and wanted all the papers in all matters turned over to him. I told him that I had done considerable work, that I was ill, and that I was not in a position to contest the matter at the present time; that she had come to me through an organization where I was in duty bound to do my utmost for her. I told him if she insisted upon a substitution she could have the substitution if she wanted it. He said to me ' Well, what about this check of $1,125.' I told him that if he had it he was welcome to it; he could present to the bank and certify it. It was the first time I met Mr. Bauch, never saw him before. He went over to the bank there and telephoned to me that the bank told him that there was not $1,125 there, at the time. I told him I was sure there was $1,125 there, that I had purposely seen to it that the money had been there, $1,125. * * *."

Respondent's testimony is then to the effect that three checks for $100 each had been given to a client as a personal loan on the promise that they would be put in at different days, but they had all been presented on October first and honored that day. Respondent's testimony then proceeds: " I asked the teller how much was my balance. He said there was nearly a thousand dollars. I said to Mr. Bauch over the telephone ' Wait, I will draw a check for all the money that I have in the bank. Tomorrow is our Day of Atonement. I will have the balance for you — I will have the balance for you the day following.' He says, ' I will wait and communicate with my clients.' Finally in the afternoon he called me up and said ' I will take the $900.' I gave him $900 and he wrote on the back of the check ' October 5, 1927, Received $900 on account of this check,'— signed by Mr. Bauch. The day following the Day of Atonement I was not in the office. On October 7th, the day right after the Atonement, before ten o'clock I had the balance of $225, and he signed ' Received $225, balance of within check,' and signed his name, which is indorsed upon this $1,125 check."

Respondent attributes the complaint to the Bar Association to his failure to accede to Mr. Bauch's demand for $250 for his services in the matter.

Respondent testified that within one day after his collection of the settlement in the insurance matter, he placed $3,125 in an envelope marked " This is the property of Annie Dunst " in his vault. His testimony is to the effect that the money remained in his vault throughout the period in question. It is significant

that there is no record of the withdrawal of any such amount from his various bank accounts. His testimony is that this amount he made up of withdrawals from his various accounts and from a surplus in his vault. No one witnessed his placing of this $3,125 in the vault, nor did any one witness his subsequent withdrawals.

The testimony of the disinterested bank clerks shows that while the $3,125 check was deposited on August twenty-ninth, it was not presented for payment until September tenth, and, when not paid, protested on September twelfth.

There is testimony by Eve Lipman Schachet, a stenographer formerly in the employ of respondent, who corroborates respondent as to the arrangement for the check dated September tenth.

Assuming respondent's story as to the arrangement for the giving of the check for $3,125 dated September tenth (and in so assuming it is necessary to disregard the testimony of Mrs. Dunst), we still have an obligation on the part of the respondent to keep the fund intact to meet the check at its date. There is no testimony that respondent was authorized to use the whole or any part of it. The money was not in the bank when the check was presented for payment. We cannot believe the testimony of respondent to the effect that it was presented for payment before its due date, for the disinterested testimony of the bank clerks is otherwise. Nor can it be believed that at that time respondent had the necessary amount in his vault, for subsequent developments negative that idea. If he had this money in his vault, why did he give Mrs. Dunst only $1,600 in cash, and two checks which were likewise dishonored upon presentation, and the larger of the two was met in installments only after the retention of another attorney?

The obligation of an attorney to make prompt payment to his client of the amount of any settlement of litigation intrusted to him (less his agreed fee) is inescapable. If the client desires to have him retain the money for any length of time, it should be evidenced by a written authorization to that effect. An oral agreement is easily concocted by an unscrupulous attorney, and can be as easily denied (if actually made) by a client who changes his mind. The only safe procedure is to have such an agreement, if made, committed to writing.

Nor is the obligation of an attorney to keep his client's funds at all times intact, ready to be paid to him, satisfied by an alleged deposit in a safe deposit vault. Such a method of handling the funds of others, with no proof producible or produced that they were really deposited therein free and clear from all claims, segregated and specially earmarked as the funds of the client, is suspicious and smells of bad faith. The proper place for trust funds is in

a bank or trust company, deposited in a trust account, where the good faith of the attorney can always be demonstrated by the books of the depositary, showing the daily balances in that account, and that the funds belonging to a particular client have always remained intact. This is the method, open to the light of day, which an honest attorney follows. The other method, of alleged funds placed in a safe deposit box under the sole control of the attorney, with no way to verify his claims or check up on his financial proceedings, does not commend itself as one which an honest lawyer would choose.

We find that respondent has been guilty of dishonest and unprofessional conduct under the supplemental charge herein (the Dunst matter), but in view of the fact that he had repaid (though tardily) the amount due to his client before the matter was brought to the attention of the grievance committee of the Bar Association, we think the interests of justice will be served by his suspension from the practice of the law for the period of two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.